



FILED

Jun 23 2020, 11:15 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 18S-CR-595

## Katelin Eunjoo Seo,
*Appellant (Defendant)*

–v–

## State of Indiana,
*Appellee (Plaintiff)*

---

Argued: April 18, 2019 | Decided: June 23, 2020

Appeal from the Hamilton Superior Court
No. 29D01-1708-MC-5640
The Honorable Steven R. Nation, Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 29A05-1710-CR-2466

---

**Opinion by Chief Justice Rush**

Justices David and Goff concur.
Justice Massa dissents with separate opinion in which Justice Slaughter joins in part.
Justice Slaughter dissents with separate opinion.

**Rush, Chief Justice.**

When Katelin Seo was placed under arrest, law enforcement took her iPhone believing it contained incriminating evidence. A detective got a warrant to search the smartphone, but he couldn't get into the locked device without Seo's assistance. So the detective got a second warrant that ordered Seo to unlock her iPhone. She refused, and the trial court held her in contempt.

We reverse the contempt order. Forcing Seo to unlock her iPhone would violate her Fifth Amendment right against self-incrimination. By unlocking her smartphone, Seo would provide law enforcement with information it does not already know, which the State could then use in its prosecution against her. The Fifth Amendment's protection from compelled self-incrimination prohibits this result. We thus reverse and remand.

# Facts and Procedural History

Katelin Seo contacted her local sheriff's department claiming D.S. had raped her. Detective Bill Inglis met with Seo, and she told him that her smartphone—an iPhone 7 Plus—contained relevant communications with the accused. With Seo's consent, officers completed a forensic download of the device and returned it.

Based on the evidence recovered from the iPhone and the detective's conversations with Seo, no charges were filed against D.S. Instead, law enforcement's focus switched to Seo. D.S. told Detective Inglis that Seo stalked and harassed him, and the detective's ensuing investigation confirmed those claims.

Detective Inglis learned that Seo first contacted D.S. from the phone number associated with her iPhone. But D.S. then began receiving up to thirty calls or text messages daily from dozens of different, unassigned numbers. Yet, because the substance of the contact was consistent, the detective believed that Seo placed the calls and texts using an app or internet program to disguise her phone number. As a result of this

investigation, the State charged Seo with several offenses and issued an arrest warrant.

When Detective Inglis arrested Seo, he took possession of her locked iPhone. Officers asked Seo for the device's password, but she refused to provide it. To clear this hurdle, Detective Inglis obtained two search warrants. The first authorized a forensic download of Seo's iPhone so that law enforcement could search the device for "incriminating evidence." And the second "compelled" Seo to unlock the device and stated that she would be subject "to the contempt powers of the court" if she failed to do so. After Seo again refused to unlock her iPhone, the State moved to hold her in contempt.

At the ensuing hearing, Seo argued that forcing her to unlock the iPhone would violate her Fifth Amendment right against self-incrimination. The trial court disagreed and held Seo in contempt, concluding that "[t]he act of unlocking the phone does not rise to the level of testimonial self-incrimination." Seo appealed, and the trial court stayed its contempt order.

While her appeal was pending, Seo entered into a plea agreement with the State. She pleaded guilty to one count of stalking, and the State dismissed eighteen other charged offenses without prejudice. But because the contempt citation remained in place, Seo still faced the threat of further sanction for disobeying that order. A divided panel of our Court of Appeals reversed the court's pending contempt order. *Seo v. State*, 109 N.E.3d 418, 440–41 (Ind. Ct. App. 2018).

We granted transfer, vacating the Court of Appeals decision. Ind. Appellate Rule 58(A).[1]

---

[1] Our dissenting colleagues are incorrect in finding this case moot, as there has not yet been "a settlement of all differences between the parties," *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 451 (1911). Justice Massa asks, "What could the State now gain from Seo unlocking her device?" *Post*, at 3. But the State has already answered that question—to complete its investigation of Seo and potentially file additional charges. After pleading guilty, Seo filed a motion requesting that law enforcement return her iPhone—which has remained in police

## Standard of Review

Seo's challenge to the trial court's contempt order alleges a constitutional violation, and thus our review is de novo. *See Myers v. State*, 27 N.E.3d 1069, 1074 (Ind. 2015).

## Discussion and Decision

The Fifth Amendment's Self-Incrimination Clause protects a person from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Embedded within this constitutional principle is the requirement that the State produce evidence against an individual through "the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." *Estelle v. Smith*, 451 U.S. 454, 462 (1981) (cleaned up). The privilege thus protects an accused from being forced to provide the State with even a link in the chain of evidence needed for prosecution. *See Hoffman v. United States*, 341 U.S. 479, 486 (1951). Yet, not all compelled, incriminating evidence falls under this constitutional protection: the evidence must also be testimonial. *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 189 (2004).

---

custody since it was seized—because she had "no pending criminal cases." The State objected, and during a hearing on the motion, the State clarified that its interest in accessing Seo's iPhone is "not limited" to just the charges covered by the plea agreement. The prosecutor explained that the State could not "do a full investigation" or "be in a position to either not bring or choose to bring new cases" until it had evidence from the device. Then at oral argument, the State not only reiterated its continued interest in searching Seo's iPhone but also argued that the case was not moot because the "threat of a sanction still hangs over [Seo's] head." So, contrary to the dissenting view, the State has not settled all claims with Seo; and the stayed contempt order has not automatically terminated. *See Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 446–47 (2009) (recognizing that a case is not moot when there "remains a live dispute"); *United States v. Harris*, 582 F.3d 512, 516 (3d Cir. 2009) (finding that the termination of underlying criminal proceedings did not render a coercive civil contempt order moot when the purpose and intent of the order "remain alive and well"). In short, this case presents a live dispute and thus our decision renders effective relief. But irrespective of mootness, this case presents a novel, important issue of great public importance that will surely recur.

To be testimonial, "an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information." *Doe v. United States*, 487 U.S. 201, 210 (1988). The most common form of testimony is verbal or written communications—the vast amount of which will fall within the privilege. *Id.* at 213–14. But physical acts can also have a testimonial aspect. *See Fisher v. United States*, 425 U.S. 391, 410 (1976).

When the State compels a suspect to produce physical evidence, that act is testimonial if it implicitly conveys information. *See United States v. Hubbell*, 530 U.S. 27, 36 (2000); *Pennsylvania v. Muniz*, 496 U.S. 582, 595 n.9 (1990). In certain contexts, however, the communicative aspects of the act may be rendered nontestimonial if the State can show that it already knows the information conveyed, making it a "foregone conclusion." *Fisher*, 425 U.S. at 411. In other words, the inquiry is whether the testimonial communications implicit in producing the evidence provide the State with something it does not already know.

Here, Seo argues that the State, by forcing her to unlock her iPhone for law enforcement, is requiring her to "assist in the prosecution of her own criminal case" and thus violating her right against self-incrimination. The State disagrees, claiming it already knows the implicit factual information Seo would convey by unlocking her iPhone—namely, that she "knows the password and thus has control and use of the phone."

We agree with Seo. The compelled production of an unlocked smartphone is testimonial and entitled to Fifth Amendment protection— unless the State demonstrates the foregone conclusion exception applies. Here, the State has failed to make that showing; and this case also highlights concerns with extending the limited exception to this context.

## I. The act of producing an unlocked smartphone communicates a breadth of factual information.

Giving law enforcement an unlocked smartphone communicates to the State, at a minimum, that (1) the suspect knows the password; (2) the files on the device exist; and (3) the suspect possesses those files. This broad spectrum of communication is entitled to Fifth Amendment protection

unless the State can show that it already knows this information, making it a foregone conclusion. We make these determinations after carefully reviewing the U.S. Supreme Court precedent that has created and evaluated both the act of production doctrine and its accompanying foregone conclusion exception.

Our starting point is *Fisher v. United States*, 425 U.S. 391 (1976). There, the IRS subpoenaed several taxpayers' documents that accountants prepared and the taxpayers' attorneys possessed. *Id.* at 394–96. The attorneys responded that complying with the subpoenas would violate their clients' rights against self-incrimination. *Id.* at 395–96.[2] The Court disagreed. *Id.* at 414.

In reaching that conclusion, *Fisher* considered what, if any, incriminating testimony would be compelled by responding to a documentary summons. *Id.* at 409. It was here that the Court created the act of production doctrine: producing documents in response to a subpoena can be testimonial if the act concedes the existence, possession, or authenticity of the documents ultimately produced. *Id.* at 410. But when the government can show that it already knows this information, then the testimonial aspects of the act are a "foregone conclusion," *id.* at 411, and complying with the subpoena becomes a question "not of testimony but of surrender," *id.* (quoting *In re Harris*, 221 U.S. 274, 279 (1911)). This was the situation in *Fisher*—the Government knew who possessed the tax documents, and it could independently confirm the documents' existence and authenticity through the accountants who prepared them. *Id.* at 412–13. So, the Court narrowly held that "compliance with a summons directing the taxpayer to produce the accountant's documents involved in

---

[2] *Fisher* recognized that compelling the attorneys to hand over the documents did not "implicate whatever Fifth Amendment privilege the taxpayer might have enjoyed from being compelled to produce them himself." 425 U.S. at 402. But because the taxpayers had transferred the documents for legal advice protected by the attorney–client privilege, *id.* at 403–04, the Court addressed whether the Government could have compelled the taxpayers themselves to produce the documents, *id.* at 405.

these cases" did not implicate incriminating testimony within the Fifth Amendment's protection. *Id.* at 414.

*Fisher* was the first, and only, Supreme Court decision to find that the testimony implicit in an act of production was a foregone conclusion. In contrast, the government failed to make that showing in the other two relevant decisions: *United States v. Doe*, 465 U.S. 605 (1984) (*Doe I*) and *United States v. Hubbell*, 530 U.S. 27 (2000).

In *Doe I*, the Government served five subpoenas commanding a business owner to produce certain documents. 465 U.S. at 606–07. He refused, arguing that complying with the subpoenas would violate his right against self-incrimination. *Id.* at 607–08. The District Court agreed, finding that compliance would compel the business owner "to admit that the records exist, that they are in his possession, and that they are authentic." *Id.* at 613 & n.11.

The *Doe I* Court affirmed the District Court's finding "that the act of producing documents would involve testimonial self-incrimination." *Id.* at 613–14. The Court then explained that the Government was not foreclosed from producing "evidence that possession, existence, and authentication were a 'foregone conclusion,'" but that it had "failed to make such a showing." *Id.* at 614 n.13 (quoting *Fisher*, 425 U.S. at 411).

Similarly, the Court in *Hubbell* found that the foregone conclusion exception did not apply. 530 U.S. at 44. There, the Government served a subpoena requesting a vast array of documents. *Id.* at 31. In response, Hubbell produced 13,120 pages; and he was later indicted based on information gleaned from their contents. *Id.* In finding that Hubbell's compliance with the subpoena violated his right against self-incrimination, the Court rejected two of the Government's arguments.

*Hubbell* first refused to equate the physical act of handing over the documents with the testimony implicit in the act. *Id.* at 40–41. The Court agreed that the testimonial aspect of responding to a documentary summons "does nothing more than establish the existence, authenticity, and custody of items that are produced." *Id.* But it rebuffed the Government's "anemic view" of the act of production as a "simple

physical act." *Id.* at 43. The Court explained that a physical act, nontestimonial in character, cannot be "entirely divorced from its 'implicit' testimonial aspect." *Id.*

*Hubbell* also rejected the Government's argument that, under *Fisher*, "the existence and possession of such records by any businessman is a 'foregone conclusion.'" *Id.* at 44. The Court referred to *Fisher*'s unique context and explained, "Whatever the scope of this 'foregone conclusion' rationale, the facts of this case plainly fall outside of it." *Id.* Unlike in *Fisher*, the *Hubbell* Court reasoned that, because the Government failed to show "it had any prior knowledge of either the existence or the whereabouts of the . . . documents ultimately produced," the foregone conclusion exception did not apply. *Id.* at 45.

*Fisher*, *Doe I*, and *Hubbell* establish that the act of producing documents implicitly communicates that the documents can be physically produced, exist, are in the suspect's possession, and are authentic. And this trilogy of Supreme Court precedent further confirms that the foregone conclusion exception must consider these broad communicative aspects. *See Commonwealth v. Davis*, 220 A.3d 534, 547 (Pa. 2019) (recognizing that "the Supreme Court has made, and continues to make, a distinction between physical production and testimonial production"), *petition for cert. filed* (U.S. Apr. 20, 2020) (No. 19-1254).

In this way, the act of production doctrine links the physical act to the documents ultimately produced. *See* Laurent Sacharoff, *What Am I Really Saying When I Open My Smartphone? A Response to Orin S. Kerr*, 97 Tex. L. Rev. Online 63, 68 (2019). And the foregone conclusion exception relies on this link by asking whether the government can show it already knows the documents exist, are in the suspect's possession, and are authentic. *Id.* True, the documents' contents are not protected by the Fifth Amendment because the government did not compel their creation. *See Doe I*, 465 U.S. at 611–12; *Fisher*, 425 U.S. at 409–10. But the specific documents "ultimately produced" implicitly communicate factual assertions solely through their production. *See Hubbell*, 530 U.S. at 36 & n.19, 45.

When extending these observations to the act of producing an unlocked smartphone, we draw two analogies. First, entering the password to

unlock the device is analogous to the physical act of handing over documents. Sacharoff, *supra*, at 68. And second, the files on the smartphone are analogous to the documents ultimately produced. *Id.*

Thus, a suspect surrendering an unlocked smartphone implicitly communicates, at a minimum, three things: (1) the suspect knows the password; (2) the files on the device exist; and (3) the suspect possessed those files.[3] And, unless the State can show it already knows this information, the communicative aspects of the production fall within the Fifth Amendment's protection. Otherwise, the suspect's compelled act will communicate to the State information it did not previously know—precisely what the privilege against self-incrimination is designed to prevent. *See Couch v. United States*, 409 U.S. 322, 328 (1973).

This leads us to the following inquiry: has the State shown that (1) Seo knows the password for her iPhone; (2) the files on the device exist; and (3) she possessed those files?

## II. The foregone conclusion exception does not apply.

As discussed above, compelling Seo to unlock her iPhone would implicitly communicate certain facts to the State. And for those communicative aspects to be rendered nontestimonial, the State must establish that it already knows those facts.

Even if we assume the State has shown that Seo knows the password to her smartphone, the State has failed to demonstrate that any particular

---

[3] The majority of courts to address the scope of testimony implicated when a suspect is compelled to produce an unlocked smartphone have reached a similar conclusion. *See State v. Trant*, No. 15-2389, 2015 WL 7575496, at *2–3 (D. Me. Oct. 27, 2015); *Sec. & Exch. Comm'n v. Huang*, No. 15-269, 2015 WL 5611644, at *2–4 (E.D. Penn. Sept. 23, 2015); *Pollard v. State*, 287 So. 3d 649, 656–57 (Fla. Dist. Ct. App. 2019), *reh'g denied*; *G.A.Q.L. v. State*, 257 So. 3d 1058, 1061–65 (Fla. Dist. Ct. App. 2018); *People v. Spicer*, 125 N.E.3d 1286, 1290–92 (Ill. App. Ct. 2019); *In re Grand Jury Investigation*, 88 N.E.3d 1178, 1180–82 (Mass. App. Ct. 2017); *cf. United States v. Wright*, 431 F. Supp. 3d 1175, 1186–88 (D. Nev. 2020); *In re Search Warrant Application for Cellular Tel. v. Barrera*, 415 F. Supp. 3d 832, 838 n.2 (N.D. Ill. 2019); *In re Residence in Oakland, Cal.*, 354 F. Supp. 3d 1010, 1016 (N.D. Cal. 2019); *In re Application for a Search Warrant*, 236 F. Supp. 3d 1066, 1073 (N.D. Ill. 2017); *State v. Diamond*, 905 N.W.2d 870, 875 (Minn. 2018).

files on the device exist or that she possessed those files. Detective Inglis simply confirmed that he would be fishing for "incriminating evidence" from the device. He believed Seo—to carry out the alleged crimes—was using an application or internet program to disguise her phone number. Yet, the detective's own testimony confirms that he didn't know which applications or files he was searching for:

> There are numerous, and there's probably some that I'm not even aware of, numerous entities out there like Google Voice and Pinger and Text Now and Text Me, and I don't know, I don't have an all-encompassing list of them, however if I had the phone I could see which ones she had accessed through Google.

In sum, law enforcement sought to compel Seo to unlock her iPhone so that it could then scour the device for incriminating information. And Seo's act of producing her unlocked smartphone would provide the State with information that it does not already know. But, as we've explained above, the Fifth Amendment's privilege against compulsory self-incrimination prohibits such a result. Indeed, to hold otherwise would sound "the death knell for a constitutional protection against compelled self-incrimination in the digital age." *Commonwealth v. Jones*, 117 N.E.3d 702, 724 (Mass. 2019) (Lenk, J., concurring); *see also Davis*, 220 A.3d at 549 ("[T]o apply the foregone conclusion rationale in these circumstances would allow the exception to swallow the constitutional privilege.").

Though the foregone conclusion exception does not apply to these facts, this case underscores several reasons why the narrow exception may be generally unsuitable to the compelled production of any unlocked smartphone. We discuss three concerns below.

## III. This case highlights concerns with extending the limited foregone conclusion exception to the compelled production of an unlocked smartphone.

Extending the foregone conclusion exception to the compelled production of an unlocked smartphone is concerning for three reasons: such an expansion (1) fails to account for the unique ubiquity and capacity of smartphones; (2) may prove unworkable; and (3) runs counter to U.S. Supreme Court precedent. We address each in turn.

### A. The compelled production of an unlocked smartphone is unlike the compelled production of specific business documents.

Smartphones are everywhere and contain everything. They have become such "a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley v. California*, 573 U.S. 373, 385 (2014); *see also City of Ontario v. Quon*, 560 U.S. 746, 760 (2010). Indeed, a 2019 report from the Pew Research Center revealed that 81% of Americans own a smartphone, up from 35% in 2011.[4] The Supreme Court in *Fisher* (1976), *Doe I* (1984), or *Hubbell* (2000) surely could not have anticipated that such devices would become so common or imagined the breadth and depth of information they could contain.

Notably, in each of those cases, a subpoena confined the information implicated by the compelled production. *See Hubbell*, 530 U.S. at 45–46; *Doe I*, 465 U.S. at 606–07, 607 nn.1–2; *Fisher*, 425 U.S. at 394–95, 394 nn.2–3. *Fisher* acknowledged this limited scope, stating that the subpoenas there sought "documents of unquestionable relevance to the tax investigation," but that "[s]pecial problems of privacy . . . might be presented by subpoena of a personal diary." 425 U.S. at 401 n.7; *see also Barrett v.*

---

[4] Pew Research Ctr., Mobile Fact Sheet (June 12, 2019), https://www.pewresearch.org/internet/fact-sheet/mobile/ [https://perma.cc/8ZUY-EJDG].

*Acevedo*, 169 F.3d 1155, 1167–68 (8th Cir. 1999) (en banc) (discussing the circuit split as to whether personal diaries can be subpoenaed); Samuel A. Alito, Jr., *Documents and the Privilege Against Self-Incrimination*, 48 U. Pitt. L. Rev. 27, 81 (1986) (opining that "certain types of highly private documents probably should not be obtainable by subpoena, regardless of whether they are self-incriminating"). And the *Doe I* Court remarked that the compelled documents, which "pertained to respondent's businesses," were less personal than those sought in *Fisher*, which "related to the taxpayers' individual tax returns." *Doe I*, 465 U.S. at 610 n.7. An unlocked smartphone, however, contains far more private information than a personal diary or an individual tax return ever could. Yet, when suspects are compelled to surrender their unlocked smartphones, there is no limiter like a documentary subpoena for specific files. *See, e.g.*, *United States v. Bishop*, 910 F.3d 335, 336 (7th Cir. 2018), *cert. denied*, 139 S. Ct. 1590 (2019).

*Hubbell* further illustrates the considerable difference between complying with a court order to produce an unlocked smartphone and complying with a documentary summons. Recall that, in *Hubbell*, the Government had not shown that it had any prior knowledge of either the existence or location of 13,120 pages of documents. 530 U.S. at 45. Though not an insignificant amount of information, it pales in comparison to what can be stored on today's smartphones. Indeed, the cheapest model of last year's top-selling smartphone, with a capacity of 64 gigabytes of data, can hold over 4,000,000 pages of documents—more than 300 times the number of pages produced in *Hubbell*.[5] It is no exaggeration to describe a smartphone's passcode as "the proverbial 'key to a man's kingdom.'" *United States v. Djibo*, 151 F. Supp. 3d 297, 310 (E.D.N.Y. 2015).

---

[5] *See* Steve McCaskill, *iPhone XR Was Best-Selling Smartphone of 2019*, TechRadar (Feb. 26, 2020), https://www.techradar.com/news/iphone-xr-was-best-selling-smartphone-of-2019 [https://perma.cc/6PAC-WZT9]; Apple iPhone XR Tech Specs, https://www.apple.com/iphone -xr/specs/ [https://perma.cc/X9MU-Q9W4]; *How Many Pages in a Gigabyte?*, Lexis Nexis Discovery Series Fact Sheet, https://www.lexisnexis.com/applieddiscovery/lawlibrary /whitePapers/ADI_ FS_PagesInAGigabyte.pdf [https://perma.cc/JJP7-JQK5].

This brings us to a second concern with extending the foregone conclusion exception—it may prove unworkable in this context.

## B. Extending the foregone conclusion exception to the compelled production of a smartphone may prove unworkable.

Today's smartphones "could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." *Riley*, 573 U.S. at 393. And they can contain, in digital form, the "combined footprint of what has been occurring socially, economically, personally, psychologically, spiritually and sometimes even sexually, in the owner's life." *Djibo*, 151 F. Supp. 3d at 310.

Recognizing these realities, several courts have determined that the government—prior to compelling a suspect to unlock their smartphone—must specifically identify the files it seeks with reasonable particularity.[6] But even then, the government should have access to only those files. Yet, compelling the production of an unlocked smartphone gives the government access to everything on the device, not just those files it can identify with "reasonable particularity." For example, here, even if the State could show that it knew of and could identify specific files on Seo's iPhone, there is nothing to restrict law enforcement's access to only that

---

[6] *See In re Application for a Search Warrant*, 236 F. Supp. 3d at 1068, 1072–74; *Trant*, 2015 WL 7575496, at *2–3; *Huang*, 2015 WL 5611644, at *2–4; *Pollard*, 287 So. 3d at 657; *G.A.Q.L.*, 257 So. 3d at 1063–65; *Spicer*, 125 N.E.3d at 1290–92; *In re Grand Jury Investigation*, 88 N.E.3d at 1181–82. And several courts evaluating this issue in the context of other electronic devices, such as computers or hard drives, have similarly required the government to identify the information sought with reasonable particularity. *See In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1345–47 (11th Cir. 2012); *In re Decryption of a Seized Data Storage Sys.*, No. 13-M-449, 2013 WL 12327372, at *4 (E.D. Wis. Apr. 19, 2013); *United States v. Hatfield*, No. 06-CR-0550 (JS), 2010 WL 1423103, at *1–2 (E.D.N.Y. Apr. 7, 2010); *In re Boucher*, No. 2:06-mj-91, 2009 WL 424718, at *3–4 (D. Vt. Feb. 19, 2009); *cf. United States v. Apple MacPro Comput.*, 851 F.3d 238, 247–48 (3d Cir. 2017); *In re Search of a Residence*, No. 17-mj-70656-JSC-1, 2018 WL 1400401, at *8–12 (N.D. Cal. Mar. 20, 2018).

information. After all, the warrant authorized a search of Seo's device without limitation.

Such unbridled access to potential evidence on her iPhone—or any smartphone—raises several complex questions. For example, if officers searching a suspect's smartphone encounter an application or website protected by another password, will they need a separate motion to compel the suspect to unlock that application or website? And would the foregone conclusion exception apply to that act of production as well? Suppose law enforcement opens an application or website and the password populates automatically. Can officers legally access that information? Or what if a suspect has a cloud-storage service—like iCloud or Dropbox—installed on the device, which could contain hundreds of thousands of files. Can law enforcement look at those documents, even though this windfall would be equivalent to identifying the location of a locked storage facility that officers did not already know existed? Such complexity is neither necessary nor surprising: the foregone conclusion exception is, in this context, a low-tech peg in a cutting-edge hole.

This leads to a third concern with extending the foregone conclusion exception—it seems imprudent in light of recent Supreme Court precedent concerning smartphones and the limited, questionable application of the exception.

## C. U.S. Supreme Court precedent and the foregone conclusion exception's limited application counsel against extending it further.

The Supreme Court has hesitated to apply even entrenched doctrines to novel dilemmas, wholly unforeseen when those doctrines were created. Indeed, the Court recently observed that, when "confronting new concerns wrought by digital technology," it "has been careful not to uncritically extend existing precedents." *Carpenter v. United States*, 138 S. Ct. 2206, 2222 (2018). To that point, four years earlier, in *Riley*, the Court held that the search-incident-to-arrest exception to the warrant requirement does not extend to a cell phone found on an arrestee. 573 U.S. at 401–02. And in *Carpenter*, the Court held that the third-party doctrine

does not extend to cellular site location information, at least when seven days' worth of data is obtained. 138 S. Ct. at 2217 & n.3. The Supreme Court's refusal to extend these two established doctrines—each far more deeply rooted than the foregone conclusion exception—is instructive.

Though *Riley* and *Carpenter* were decided under the Fourth Amendment, the Court's concern in each case was with the "privacy interests" implicated by smartphones. *Riley*, 573 U.S. at 397; *Carpenter*, 138 S. Ct. at 2214–15. And that privacy concern likewise applies to the Fifth Amendment's privilege against self-incrimination. Even though this privilege is not "a general protector of privacy," *Fisher* recognized that it "truly serves privacy interests" by protecting suspects from being compelled to provide private, self-incriminating testimony. 425 U.S. at 399, 401; *see also id.* at 416–17 (Brennan, J., concurring in the judgment) ("Expressions are legion in opinions of this Court that the protection of personal privacy is a central purpose of the privilege against compelled self-incrimination."); *Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52, 55 (1964); *In re Grand Jury Proceedings*, 632 F.2d 1033, 1042–44 (3d Cir. 1980).

The limited, and questionable, application of the foregone conclusion exception also cautions against extending it further. Indeed, *Fisher* was decided over forty-four years ago, and it remains the lone U.S. Supreme Court decision to find that the exception applied. In the intervening years, the Court has discussed it twice and in only one context: in grand jury proceedings when a subpoena compelled the production of business and financial records. During this same time period, legal scholars—including three current members of the Supreme Court—have wondered whether *Fisher* interpreted the Fifth Amendment too narrowly, calling into question the viability of the foregone conclusion exception itself. *See Hubbell*, 530 U.S. at 49–56 (Thomas, J., concurring); *Carpenter*, 138 S. Ct. at 2271 (Gorsuch, J., dissenting); Alito, Jr., *supra*, at 45–51; *see also, e.g.*, Bryan H. Choi, *The Privilege Against Cellphone Incrimination*, 97 Tex. L. Rev. Online 73, 74 n.6 (2019); Richard A. Nagareda, *Compulsion "To Be a Witness" and the Resurrection of* Boyd, 74 N.Y.U. L. Rev. 1575, 1606 & nn.124–25 (1999); Robert Heidt, *The Fifth Amendment Privilege and Documents—Cutting* Fisher*'s Tangled Line*, 49 Mo. L. Rev. 439, 443 (1984).

Regardless of the foregone conclusion exception's viability, it seems imprudent to extend it beyond its one-time application. *Cf. Silverman v. United States*, 365 U.S. 505, 510, 512 (1961) (deciding not to extend the rationale of a factually distinct case "by even a fraction of an inch").

It is not surprising that courts to recently address this issue—how the Fifth Amendment applies to the compelled production of unlocked electronic devices—have either declined to extend the foregone conclusion exception or have not mentioned it at all.[7] Not only was the exception crafted for a vastly different context, but extending it further would mean expanding a decades-old and narrowly defined legal exception to dynamically developing technology that was in its infancy just a decade ago. And it would also result in narrowing a constitutional right. Yet, while we have identified three concerns with extending the foregone conclusion exception to this context, we do not need to make a general pronouncement on its validity because it simply does not apply here.

At the same time, we emphasize that there are several ways law enforcement can procure evidence from smartphones without infringing on an individual's Fifth Amendment rights. For example, officers could try to obtain information from third parties under the Stored Communications Act. *See* 18 U.S.C. 121 §§ 2701–2713 (2018). Alternatively, two companies—Cellebrite and Grayshift—offer law enforcement agencies affordable products that provide access to a locked smartphone. *See generally, e.g., United States v. Chavez-Lopez*, 767 F. App'x 431, 433–34 (4th Cir. 2019). Or officers could seek an order compelling the smartphone's manufacturer to help bypass the lock screen. *See In re XXX, Inc.*, No. 14 Mag. 2258, 2014 WL 5510865 (S.D.N.Y. Oct. 31, 2014). And if law enforcement wants to get into a smartphone for reasons other than prosecution, they can offer immunity to the device's owner. *See Doe I*, 465 U.S. at 614–15. But the State cannot fish for incriminating evidence by forcing Seo to give unfettered access to her iPhone when it has failed to

---

[7] *See United States v. Jimenez*, 419 F. Supp. 3d 232, 233 (D. Mass. 2020); *Wright*, 431 F. Supp. 3d at 1186–88; *In re Residence in Oakland*, 354 F. Supp. 3d at 1016–18; *Davis*, 220 A.3d at 550.

show that any files on Seo's smartphone exist or that she possessed those files.

Nearly a century ago, U.S. Supreme Court Justice Louis Brandeis cautioned, "Ways may some day be developed by which the government, without removing papers from secret drawers, can reproduce them in court, and by which it will be enabled to expose to a jury the most intimate occurrences of the home." *Olmstead v. United States*, 277 U.S. 438, 474 (1928) (Brandeis, J., dissenting). That day has come. And to allow the State, on these facts, to force Seo to unlock her iPhone for law enforcement would tip the scales too far in the State's favor, resulting in a seismic erosion of the Fifth Amendment's privilege against self-incrimination. This we will not do.

## Conclusion

Forcing Seo to unlock her iPhone for law enforcement would violate her Fifth Amendment right against self-incrimination. We thus reverse the trial court's order finding Seo in contempt and instruct the court to dismiss the citation.

David and Goff, JJ., concur.
Massa, J., dissents with separate opinion in which Slaughter, J., joins in part.
Slaughter, J., dissents with separate opinion.

ATTORNEYS FOR APPELLANT
William J. Webster
Carla V. Garino
Webster & Garino LLC
Westfield, Indiana

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Stephen R. Creason
Chief Counsel

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR AMICI CURIAE ELECTRONIC FRONTIER
FOUNDATION, AMERICAN CIVIL LIBERTIES UNION, AND
AMERICAN CIVIL LIBERTIES UNION OF INDIANA
Kenneth J. Falk
ACLU of Indiana
Indianapolis, Indiana

Andrew Crocker
Electronic Frontier Foundation
San Francisco, California

ATTORNEY FOR AMICI CURIAE STATES OF UTAH, GEORGIA,
IDAHO, LOUISIANA, MONTANA, NEBRASKA, OKLAHOMA, AND
PENNSYLVANIA
Kevin S. Smith
Special Assistant Utah Attorney General
Church Church Hittle & Antrim
Fishers, Indiana

**Massa, J., dissenting.**

I respectfully dissent from the Court's opinion deciding the merits of this case because it was mooted when the underlying criminal case was dismissed. And this now-moot case shouldn't be resolved under our "great public interest" exception because doing so could—in violation of the core principles of federalism—leave our Court as the final arbiter of our nation's fundamental law.

The gist of Seo's purported behavior over the summer and fall of 2017 is this: starting in June, Seo unrelentingly implored a man to either marry or impregnate her. In July, Seo started following and sending troubling messages to a woman who reported her to a supervisor for showing a horror film to the woman's preschool children at the daycare where Seo worked. Seo was charged with various crimes in numerous cases for these interactions, and, on **August 8**, the trial court ordered Seo to unlock her iPhone to obtain evidence for a case involving the man, warning that her refusal could subject her to being held in contempt. On **September 22**, after she persistently refused to unlock the device, the trial court held Seo in contempt and ordered her incarcerated if she didn't comply by the end of the day. Three days later, however, the court stayed the order after Seo indicated she would appeal it.

The next July, Seo and the prosecution reached a global agreement: the State dismissed all other charges against Seo when she pleaded guilty to a single stalking charge involving the woman. All the charges in the cases involving the man—including those in the case where Seo was held in contempt for refusing to unlock her device—were dismissed. The next month, our Court of Appeals reversed the contempt order. Later yet, the State successfully opposed Seo's request for the return of her device pending our resolution of the case.

At the outset, we shouldn't reach Seo's constitutional claim because she is impermissibly waging a collateral attack on the trial court's August 8 order (compelling her to unlock her phone) through this appeal of the trial court's September 22 order (holding her in contempt). "Collateral attack of a previous order is allowed in a contempt proceeding only if the trial court lacked subject matter or personal jurisdiction to enter the order." *State v.*

*Combs*, 921 N.E.2d 846, 851 (Ind. Ct. App. 2010) (quotation omitted). Because no one doubts the jurisdiction of the trial court here, and "[c]ontempt proceedings are not actions designed to correct errors previously made by trial courts," *id.* (quotation omitted), the Court shouldn't permit Seo to challenge the constitutional validity of the trial court's August 8 order through this appeal, *see Clark v. Atkins*, 489 N.E.2d 90, 96 (Ind. Ct. App. 1986) (explaining that even when "the questions raised concerning [an underlying] order are constitutional in nature," contempt proceedings cannot be used for a collateral attack) (citation omitted). Although her Fifth Amendment right could potentially be "irretrievably lost" if she were to unlock her device now, *Van Cauwenberghe v. Biard*, 486 U.S. 517, 524 (1988) (citation omitted), we shouldn't flout well-settled procedure to resolve Seo's claim when she had forty-five days to file an interlocutory appeal of the August 8 order before being held in contempt. *See* Ind. Appellate Rule 14(B)(1)(c)(i) (permitting interlocutory appeal if a party believes she "will suffer substantial expense, damage[,] or injury if the order is erroneous and the determination of the error is withheld until after judgment.").

Nevertheless, this case is also moot. The Court, however, suggests it remains live because, as the State avows, "the 'threat of a sanction still hangs over [Seo's] head.'" *Ante*, at 4 n.1. But the order finding Seo in contempt was mooted—and this case was mooted—when Seo reached the agreement that, among other things, resolved the case underlying the order. "Contempts of court are classified as civil and criminal." *Perry v. Pernet*, 165 Ind. 67, 70, 74 N.E. 609, 610 (1905). Criminal contempt cases survive even after an underlying cause is mooted because this contempt is "an act directed against the dignity and authority of the court which obstructs the administration of justice and which tends to bring the court into disrepute or disrespect." *State v. Heltzel*, 552 N.E.2d 31, 34 (Ind. 1990). These contempt orders subsist, then, until a defendant "has served his contempt sentence and has been released." *Bell v. State*, 1 N.E.3d 190, 192 (Ind. Ct. App. 2013).

But Seo's contempt was civil: she refused "to do something which [s]he [wa]s ordered to do for the benefit or advantage of the opposite party." *Perry*, 165 Ind. at 70, 74 N.E. at 610 (quotation omitted). Since the opposing

party "alone has an interest in the enforcement of" a civil contempt order, any associated punishment "terminates" the moment this party's interest ceases. *Id.* at 71, 610. So when an underlying cause concludes by "settlement of all differences between the parties," any attendant civil contempt proceeding "necessarily" ends. *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 451–452 (1911).[1] Here, the State reached a global settlement with Seo resolving the claims it had against her. Once these charges were settled, the civil contempt order automatically terminated. What could the State now gain from Seo unlocking her device?

The Court contends "that the State could not 'do a full investigation' or 'be in a position to either not bring or choose to bring new cases' until it had evidence from the device." *Ante*, at 4 n.1. But a year before opposing the return of Seo's device, the State returned the search warrant, acknowledging that "this matter is now closed." Return on Search Warrant, *In Re: Search Warrant*, No. 29D01-1708-MC-5624 (Hamilton Sup. Ct.); *see* Ind. Code § 35-33-5-4 (directing that, ordinarily, after a search warrant is executed, the executing officer must ensure a "return" of the warrant, stating the date and time of the search and what items were seized).[2] Instead of retaining the search warrant for further investigation, the State returned it after having settled all claims with Seo. Despite its later assertion "that its interest in accessing Seo's iPhone [wa]s 'not

---

[1] *See also State ex rel. Corn v. Russo*, 740 N.E.2d 265, 269 (Ohio 2001) ("It is well established that where the parties settle the underlying case that gave rise to the civil contempt sanction, the contempt proceeding is moot, since the case has come to an end."); *Christensen v. Sullivan*, 768 N.W.2d 798, 815 (Wis. 2009) ("[T]he most obvious case of a contempt of court that has been terminated and is no longer continuing occurs when the underlying dispute between the parties has been settled."); 17 Am. Jur. 2d Contempt § 147 ("When the parties settle the underlying case that gave rise to a civil contempt sanction, the contempt proceeding is moot since the case has come to an end.").

[2] To be sure, the trial court granted, nearly simultaneously, two "search warrants" involving Seo's cases, and this filing only "returned" the first. But in the request for the second, the State acknowledged that the trial court had already "issued a search warrant (cause number 29D01-1708-MC-5624)" for Seo's phone and merely additionally requested "that the court compel Katelin Eunjoo Seo to unlock the cell phone at issue," and that Seo "be subject to the contempt powers of the Court" if she failed to comply. Affidavit for Probable Cause, *In Re: Search Warrant*, No. 29D01-1708-MC-5640 (Hamilton Sup. Ct.).

limited' to just the charges covered by the plea agreement," *ante*, at 4 n.1, the State should have, if it sought to trawl for further charges, awaited resolution of this appeal before settling the cases. But it didn't, so this case can't provide any relief "'to the parties before the court.'" *T.W. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 121 N.E.3d 1039, 1042 (Ind. 2019) (quoting *Matter of Lawrance*, 579 N.E.2d 32, 37 (Ind. 1991)). When "[n]one of the parties seem to have any interest left in the case," this court of last resort should dismiss because it "ought not to be engaged in passing on moot-court questions." *State ex rel. Taylor v. Mount*, 151 Ind. 679, 694, 52 N.E. 407, 407 (1898).

But this Court has, for better or worse, decided moot cases "'when the issue involves a question of great public importance which is likely to recur.'" *T.W.*, 121 N.E.3d at 1042 (quoting *Matter of Tina T.*, 579 N.E.2d 48, 54 (Ind. 1991)). Indeed, the Court acknowledges it believes that, "irrespective of mootness, this case presents a novel, important issue of great public importance that will surely recur." *Ante*, at 4 n.1. Because, however, constitutional questions should be avoided unless answering them is "absolutely necessary to a disposition of the cause on its merits," *State v. Darlington*, 153 Ind. 1, 4, 53 N.E. 925, 926 (1899), this Court should—in cases resolving federal questions—employ the Article-III-mirroring mootness test recently used by Senior Judge Shepard: whether "'the issue concerns a question of great public importance which is likely to recur in a context which will continue to **evade review**,'" *Liddle v. Clark*, 107 N.E.3d 478, 482 (Ind. Ct. App. 2018) (quoting *DeSalle v. Gentry*, 818 N.E.2d 40, 49 (Ind. Ct. App. 2004)) (emphasis added), *trans. denied*. To be sure, then-Chief Justice Shepard noted that this heightened standard "is a federal mootness doctrine, stricter than our own, rooted in the requirement that Article III courts decide only live cases and controversies." *Lawrance*, 579 N.E.2d at 37 n.2. But *Lawrance* applied our relaxed standard when answering questions of Indiana law, not a federal

question that could be unreviewable, depending wholly on the prevailing party,[3] by the U.S. Supreme Court.

Although the issue in this case is clearly one of great public importance and will surely recur with other defendants, it will not evade review. Seo entered into a global agreement resolving the case tied to her contempt order before our Court of Appeals issued its opinion reversing the order holding her in contempt. But her resolution of the case before appellate review is the outlier, not the norm. *Cf. Hartman v. State*, 988 N.E.2d 785 (Ind. 2013) (reversing under the Fifth Amendment—and in an interlocutory appeal—a trial court's denial of a defendant's motion to suppress). Perhaps we still exercise our lesser standard in cases like *Lawrance* involving only questions of Indiana law. Perhaps not. *See Wallace v. City of Indianapolis*, 40 Ind. 287, 289 (1872) ("It is not our duty to decide mere legal questions, when neither party can derive any legal benefit from such decision, and we have too many real questions before us, requiring our time and labor, to allow us to write mere speculative opinions to gratify ourselves or others, and in which no one has any legal right or interest depending."). But that is a question for another day.

Instead, we must ask whether this Court should use a federally moot case to decide an important question of federal constitutional law. The answer must be no. To be sure, "the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the

---

[3] If state courts find in favor of, but not against, asserted federal rights for non-Article III litigants, opposing parties may seek Supreme Court review because they, in some way, "are faced with 'actual or threatened injury' that is sufficiently 'distinct and palpable' to support" justiciability. *ASARCO Inc. v. Kadish*, 490 U.S. 605, 618 (1989) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975). But this asymmetrical grant of appeal crumbles under scrutiny. Suppose this Court held, correctly in my view, that Seo's Fifth Amendment rights were not violated. Under *ASARCO*, that holding—**declining** to clairvoyantly extend a criminal defendant's federal rights—evades U.S. Supreme Court review. That peculiarity alone should counsel this Court against deciding federal questions "in the rarified atmosphere of a debating society," *id.* at 636 (Rehnquist, C.J., concurring in part and dissenting in part), especially considering the Judiciary Act of 1789 authorized Supreme Court review of state court decisions **only** when the state court decided a federal question **adversely** to the claimed federal right, Judiciary Act of 1789, ch. 20, § 25, 1 Stat. 73, 85–87 (1789).

limitations of a case or controversy or other federal rules of justiciability even when they address issues of federal law, as when they are called upon to interpret the Constitution." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989). But whether state courts entertain federal-law challenges absent Article III requirements "is entirely a matter of state law." *Virginia v. Hicks*, 539 U.S. 113 (2003). Our courts should not.

Both the "the national and State [judicial] systems are to be regarded as ONE WHOLE," with appeals from state courts interpreting federal laws naturally flowing "to that tribunal which is destined to unite and assimilate the principles of national justice and the rules of national decisions." Federalist No. 82 (Alexander Hamilton). To Hamilton, all cases determining federal law "shall, for weighty public reasons, receive their original or final determination in the courts of the Union." *Id.* And the nascent Supreme Court agreed, noting that a chief purpose of its review over state court opinions deciding questions of federal constitutional law

> is the importance, and even necessity of **uniformity** of decisions throughout the whole United States, upon all subjects within the purview of the constitution. Judges of equal learning and integrity, in different states, might differently interpret a statute, or a treaty of the United States, or even the constitution itself: If there were no revising authority to control these jarring and discordant judgments, and harmonize them into uniformity, the laws, the treaties, and the constitution of the United States would be different in different states, and might, perhaps, never have precisely the same construction, obligation, or efficacy, in any two states. The public mischiefs that would attend such a state of things would be truly deplorable; and it cannot be believed that they could have escaped the enlightened convention which formed the constitution.

*Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 347–48 (1816). To protect the "vital interest to the nation" it was—and is—"essential" that the U.S. Supreme Court exercise "appellate power over those judgments of the

State tribunals which may contravene the constitution or laws of the United States." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 414–15 (1821).

"The judicial power **of the United States** is extended to all cases arising under the constitution." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 178 (1803) (emphasis added). Irrefutably, the Supreme Court of the United States—not this state supreme court or any other—"is the final arbiter of federal law." *Danforth v. Minnesota*, 552 U.S. 264, 291–92 (2008) (Roberts, C.J., dissenting). Rejecting the finality of that Court betrays a core first principle of this nation: when we decide issues of federal law by exercising a flexible exception that could divest a federal court of jurisdiction under its more-rigid Article III constraints, we usurp our role in this federal system, defenestrating the U.S. Supreme Court in the process. *See Cohens*, 19 U.S. (6 Wheat.) at 371 ("[T]he judicial control of the Union over State encroachments and usurpations, was indispensable to the sovereignty of the constitution—to its integrity—to its very existence. Take it away, and the Union becomes again a loose and feeble confederacy—a government of false and foolish confidence—a delusion and a mockery!").

Although "State courts are coequal parts of our national judicial system and give serious attention to their responsibilities for enforcing the commands of the Constitution," *Sawyer v. Smith*, 497 U.S. 227, 241 (1990), this Court has long known "that the judicial power of the **United States** is extended, by the constitution, to all cases arising under the constitution, laws, and treaties of the **United States**," *Moyer v. McCullough*, 1 Ind. 339, 343 (1849). Indeed, Justice Blackford noted, while state courts may enjoy primary jurisdiction over federal questions, the "constitution requires the jurisdiction in such cases to be extended to the federal Courts." *Id.* And this view isn't constrained to the era immediately preceding the ratification of our 1851 constitution. Recently, for example—in a case unhampered by federal justiciability concerns—we chose to "await guidance from the Supreme Court and decline to find or assume [an issue of constitutional law] until the Supreme Court decides the issue authoritatively." *State v. Timbs*, 84 N.E.3d 1179, 1183 (Ind. 2017), *vacated and remanded*. Noting that "Indiana is a sovereign state within our federal

system,"[4] this Court unanimously avoided prematurely deciding an important question of federal law by declining to impose "federal obligations on the State that the federal government itself has not mandated." *Id.* at 1183–84; *see also Sparks v. State*, 499 N.E.2d 738, 741 (Ind. 1986) (declining to divine "[w]hether a federal Fifth Amendment right to due process attaches to a state grand jury proceeding"). This bedrock principle does not change—it has never been, and never will be, our role to predict decisions by the U.S. Supreme Court.

As Justice Jackson so famously proclaimed about the U.S. Supreme Court, "[w]e are not final because we are infallible, but we are infallible only because **we are final**." *Brown v. Allen*, 344 U.S. 443, 540 (1953) (Jackson, J., concurring) (emphasis added). "What, indeed, might then have been only prophecy"—that our Court now firmly establishes that it will reject that finality by deciding cases that can bypass the revising authority of the U.S. Supreme Court on important questions of federal constitutional law—"has now become fact." *Martin*, 14 U.S. (1 Wheat.) at 348. By deciding this case, the Court's message is crystal clear: it will anoint itself, at times, as the final adjudicator of federal law. To this, I cannot assent.

And as for the adjudication of that federal law, this Fifth Amendment question is the closest of close calls. Courts around the country split, falling into two camps. *See generally* Orin S. Kerr, *Compelled Decryption and the Privilege Against Self-Incrimination*, 97 Tex. L. Rev. 767 (2019); Laurent Sacharoff, *What Am I Really Saying When I Open My Smartphone? A Response to Orin S. Kerr*, 97 Tex. L. Rev. Online 63 (2019). Reasonable

---

[4] Indeed, "Indiana has its own system of legal, including constitutional, protections" subject to our ultimate review. *State v. Timbs*, 84 N.E.3d 1179, 1184 (Ind. 2017), *vacated and remanded*. Although Seo mentioned Article 1, Section 14 in her briefing at the Court of Appeals (she filed nothing with this Court), she made no separate self-incrimination argument under the Indiana Constitution. *See* Ind. Const. art. 1, § 14 ("No person, in any criminal prosecution, shall be compelled to testify against himself."). Because she failed to offer a "separate analysis based on the state constitution," this "state constitutional claim is waived." *Dye v. State*, 717 N.E.2d 5, 11 n.2 (Ind. 1999). If she had separately and independently analyzed Article 1, Section 14, we could have considered Seo's case under our Indiana Constitution without needing to grapple with these heady Article III justiciability concerns.

minds can disagree; indeed, many have. Our Court's decision on the merits today is thus not unreasonable, though I would come out the other way for the reasons further explained by Professor Kerr.[5]

Slaughter, J., joins in part.

---

[5] A few months before our nation's bicentennial anniversary, the Supreme Court all but rang the death knell of longstanding precedent that barred the government from forcing a defendant "to give evidence that tends to criminate him," *Boyd v. United States*, 116 U.S. 616, 638 (1886), holding that the Fifth Amendment is not violated merely because the State compels a defendant to turn over incriminating evidence, *Fisher v. United States*, 425 U.S. 391, 409 (1976). But the endurance of that view remains to be seen. Indeed, at least three sitting Justices of the U.S. Supreme Court have questioned this understanding. *See Carpenter v. United States*, 138 S. Ct. 2206, 2271 (2018) (Gorsuch, J., dissenting) ("[T]here is substantial evidence that the privilege against self-incrimination was also originally understood to protect a person from being forced to turn over potentially incriminating evidence."); *United States v. Hubbell*, 530 U.S. 27, 49 (2000) (Thomas, J., concurring) ("A substantial body of evidence suggests that the Fifth Amendment privilege protects against the compelled production not just of incriminating testimony, but of any incriminating evidence."); Samuel A. Alito, Jr., *Documents and the Privilege Against Self-Incrimination*, 48 U. Pitt. L. Rev. 27, 78 (1986) ("The individuals who framed, adopted, and ratified the fifth amendment left no clear evidence that they ever considered the application of the privilege to subpoenas for documents."). Even then-Justices Brennan and Stevens—no originalists!—agreed that the new framework unnecessarily and detrimentally departed from *Boyd*. *See Fisher*, 425 U.S. at 414 (Brennan, J., concurring in the judgment) (Because it represented "a serious crippling of the protection secured by the privilege against compelled production of one's private books and papers," *Fisher* was "but another step in the denigration of privacy principles settled nearly 100 years ago" in *Boyd*.); *Doe v. United States*, 487 U.S. 201, 221 n.2 (1988) (Stevens, J., dissenting) ("The Fifth Amendment provides that no person 'shall be compelled in any criminal case to be a **witness** against himself.' A witness is one who 'gives evidence in a cause.' T. Cunningham, 2 New and Complete Law Dictionary (2d ed. 1771)."). A return to *Boyd* would end the constitutional hair-splitting that results when applying old precedents to new technology in this digital age. But this Court, especially in a moot case, should not prognosticate *Boyd*'s resurrection. *Cf. Timbs*, 84 N.E.3d at 1183 (choosing "to await guidance from the Supreme Court and decline to find or assume incorporation until the Supreme Court decides the issue authoritatively"). The Supreme Court must, at some point, decide how to apply its modern Fifth Amendment jurisprudence to the compelled unlocking of a smartphone or, perhaps, return to *Boyd*. In the meantime, that uncertainty further counsels that we dismiss this appeal as moot.

**Slaughter, J., dissenting.**

I respectfully dissent. Although I agree with Justice Massa that this case is moot, I write separately because I disagree that a mootness exception justifies our reaching the merits of Seo's constitutional claim. In my view, our prevailing mootness standard does not conform to our constitution's mandate of separate governmental powers. In lieu of our prevailing standard, I would adopt the federal standard because, consistent with Article 3, Section 1 of our state constitution, it requires that courts decide only actual disputes. Applying this standard here, I would find Seo's appeal moot and not reach the merits of her Fifth Amendment claim.

A

As Justice Massa recites correctly, appellate case law in Indiana holds that our courts may decide otherwise moot cases if the legal question is sufficiently important and will likely recur. The Court says that Seo's appeal is such a case, thus justifying our reaching the merits even if her case were moot. Although case authority generally supports such a broad mootness exception, the cases are not uniform.

Some cases appear to have applied the stricter federal exception, in which a court will not decide a moot issue unless it is capable of repetition, yet evading review. But courts that have applied the federal exception confuse the issue by also invoking our laxer state mootness standard. See, e.g., *Horseman v. Keller*, 841 N.E.2d 164, 170 (Ind. 2006) (invoking state standard first: "Where there is a matter of great public importance, however, and the possibility of repetition, Indiana courts may choose to adjudicate a claim."; but concluding with federal standard: "Because the question before us is capable of repetition, yet evading review, we now address the constitutionality of [the disputed statute].") (cleaned up); *Gaither v. Indiana Dep't of Correction*, 971 N.E.2d 690, 693-94 (Ind. Ct. App. 2012) (same).

I would clarify any ambiguity in our appellate precedent and hold that any mootness doctrine consistent with our state constitution's mandate of separate governmental powers requires an actual dispute.

B

Our constitution divides the powers of government among "three separate departments; the Legislative, the Executive including the Administrative, and the Judicial". Ind. Const. art. 3, § 1. It also mandates that "except as in this Constitution expressly provided", "no person, charged with official duties under one of these departments, shall exercise any of the functions of another". *Id.* After discussing the powers and functions of the other departments, our constitution charges courts with exercising the "judicial power". *Id.* art 7, § 1. This delegation of power to the judiciary has two aspects: courts may exercise only the judicial power; and only courts may exercise this power. *Id.*

What, precisely, is the judicial power? It is the power to resolve actual disputes between adverse parties by issuing binding decrees that pronounce the parties' rights and responsibilities and afford meaningful relief to the prevailing party. Although our constitution does not contain an express "case or controversy" requirement like Article III of the federal constitution, "our explicit separation of powers clause fulfills a similar function." *Pence v. State*, 652 N.E.2d 486, 488 (Ind. 1995). Relevant here, that function limits courts to deciding justiciable controversies.

Justiciability concerns the power and propriety of a court to hear a case and award relief. As I wrote in *Horner v. Curry*, standing is an essential aspect of justiciability because it ensures that a judicial decree redresses an actual injury attributable to the defendant's wrong. 125 N.E.3d 584, 612, 615 (Ind. 2019) (Slaughter, J., concurring in the judgment). Also essential are the related doctrines of ripeness and mootness. Standing asks **who** may bring suit. Ripeness and mootness ask **when** suit may be brought. With ripeness, the issue is whether the claim has sufficiently developed—matured—into an actual controversy so that courts are resolving real disputes, not anticipated cases based on hypothetical facts. With mootness, the issue is whether a once-mature claim has "over-ripened" to the point that a court's judgment can no longer afford the claimant effective relief.

These justiciability doctrines respect and implement separation of powers. They ensure that the judiciary retains its proper role within our

constitutional order and leaves the political branches undisturbed, absent a legal wrong. And even then, courts will not exercise their power unless a claimant has standing and the case is ripe. In other words, courts will hear a case only when a claim is sufficiently mature such that the claimant has sustained an actual injury; the claimant can obtain meaningful relief from a judgment against the defendant; and the claimant continues to have a personal stake in the outcome throughout the lawsuit. What follows from these doctrines is that the only mootness standard consistent with our constitution's requirement of distributed governmental powers is one requiring an actual, ongoing controversy between adverse parties. The federal mootness standard fills that bill.

To be justiciable, the federal standard requires that an otherwise moot case be capable of repetition, yet evading review. See *Honig v. Doe*, 484 U.S. 305, 318–20 (1988). In other words, it requires a case to present a question likely to recur between the same parties in circumstances that will likely skirt judicial review. See *id.* Although the evade-review requirement is a prudential consideration, the capable-of-repetition requirement is constitutionally required, demanding a "demonstrated probability" that the same issue will arise between the same parties. *Murphy v. Hunt*, 455 U.S. 478, 482 (1982). "Where the conduct has ceased for the time being but there is a demonstrated probability that it **will** recur, a real-life controversy between parties with a personal stake in the outcome continues to exist[.]" *Honig*, 484 U.S. at 341 (Scalia, J., dissenting) (emphasis in original). Thus, this so-called "exception" to the mootness doctrine is really no exception at all but a test for determining whether an actual dispute remains.

In contrast, Indiana's prevailing mootness doctrine rejects the narrow federal doctrine, see *Matter of Lawrance*, 579 N.E.2d 32, 37 (Ind. 1991), and recognizes an open-ended exception for moot cases involving "questions of great public interest". *Id.* (cleaned up). Although these cases "typically contain issues likely to recur", *id.*, we assess whether the issues are likely to recur not with reference to a case's specific parties but to any conceivable party. See *id*. Thus, a court may decide an otherwise moot case if someone—anyone—may face the same issue in the future. But this lone requirement—an issue of great public importance likely to recur—

does not make a case suitable for adjudication under our constitution. The case must have a demonstrated probability that it will recur between the same parties; otherwise, there is no actual dispute, and any adjudication exceeds the judicial power.

Not only does our mootness doctrine lack any tie to our essential, though limited, constitutional role, but how we apply our justiciability principles has proved unpredictable in practice. Just last month, we held unanimously that the governor could not intervene in a pending disciplinary action involving the attorney general. *Matter of Hill*, 144 N.E.3d 200 (Ind. 2020). The governor asked us to answer the timely, pressing question whether our thirty-day suspension of the attorney general's law license created a vacancy in the office that triggered the governor's legal duty to fill it. No one disputed that the governor's motion raised an issue of "great public importance". Yet we denied intervention —correctly, in my view—because, among other reasons, we do not issue advisory opinions and the governor had no legally cognizable interest in the underlying case. In other words, the proposed intervention lacked the criteria for justiciability, despite the importance of the issue raised.

C

Even if I agreed that Seo has raised a "novel, important issue of great public importance that will surely recur", that standard cannot be reconciled with the actual-injury requirement implicit in our constitution's separation-of-powers command. Instead, I would adopt "capable of repetition, yet evading review" as our mootness standard. Applying it here, I would hold that Seo's Fifth Amendment claim is moot and not reach the merits.